**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.**

BILAL SALEH, individually and on behalf of a
class of others similarly situated,

       Plaintiff,                              **CLASS ACTION**

v.                                        **JURY TRIAL DEMANDED**

CRUNCH, LLC, a Delaware limited liability
company; CRUNCH FRANCHISING, LLC,
a Delaware limited liability company; and
DELIU, LLC, a Delaware limited liability
company, doing business as "Crunch Fitness
Oakland Park",

       Defendants.
_____/

## COMPLAINT

1.      Aimed at protecting consumer privacy, the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") prohibits the use of "automatic telephone dialing systems" to call cellular telephones. The TCPA bans nonemergency "robocalls," i.e., telephone calls placed through an automatic telephone dialer system, to cellular telephones unless the recipient expressly consents to receive those calls, including automatically sent text messages.

2.      On or about November 29, 2017, Plaintiff Bilal Saleh ("Plaintiff") began receiving unsolicited autodialed text messages on his cellular telephone, which were placed by or on behalf of Crunch, LLC, Crunch Franchising, LLC, and DeLiu, LLC (collectively "Defendants"). The text messages were sent as part of a marketing campaign, the purpose of which was to advertise Defendants' products and/or services to a large number of potential customers in a short period of time.

3.      As explained herein, Defendants are well aware of the TCPA's prohibitions against the use of automatic dialing systems to place calls and text messages to cell phones, but systematically use these devices as part of calling campaigns to gain customers, in spite of this knowledge.

4.      Accordingly, Plaintiff brings this action against Defendants under the TCPA on behalf of himself and others similarly situated. Plaintiff seeks statutory damages for himself and the class and an injunction prohibiting Defendants from making impermissible, TCPA violative calls in the future.

## JURISDICTION AND VENUE

5.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740 (2012).

6.      Venue is proper because a substantial portion of the events complained of occurred in this District.

## PARTIES

7.      Plaintiff Bilal Saleh is a natural person, sui juris, who resides in Broward County, Florida.

8.      Defendant Crunch, LLC. ("Crunch") is a Delaware limited liability company whose principal office is located at 22 West 19th Street, New York, NY 10011, and whose registered agent for service of process in the State of Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

9.      Defendant Crunch Franchising, LLC ("Crunch Franchising") is a Delaware limited liability company whose principal office is located at 22 West 19th Street, New York, NY 10011, and whose registered agent for service of process is Corporation Service Company,

80 State Street, Albany, NY 12207. Crunch Franchising has no registered agent in the State of Florida.

10.     Defendant DeLiu, LLC ("DeLiu") is a Florida limited liability company whose principal office is located at 4801 Peregrine Point Circle West, Sarasota, FL 34231, and whose registered agent for service of process in the State of Florida is Marc Delisle, 4801 Peregrine Point Circle West, Sarasota, FL 34231.

11.     Defendants Crunch, Crunch Franchising, and DeLiu, LLC are collectively referred to herein as "Defendants."

12.     Defendants Crunch and Crunch Fitness run a chain of fitness clubs located in and around numerous major cities.

13.     Defendant DeLiu is a franchisee of one such fitness club located at 3500 North Andrews Avenue, Oakland Park, FL 33309. From that location, DeLiu does business as Crunch Fitness Oakland Park.

14.     At all relevant times, Defendants conducted business in Florida, solicited business in Florida, engaged in a persistent, common course of conduct in Florida, and have derived substantial revenue from services rendered in Florida.

## MARKETING SCHEME

15.     There are three ways that Defendants harvest cellular telephone numbers. None of three ways include obtention of the requisite prior express written consent for sending marketing text messages.

16.     In the first of the three ways, Defendants harvest cellular telephone numbers from individuals who sign up for a free day pass on Defendants' website, www.crunch.com.

17.     Second, when an individual visits a Crunch location (like Crunch Fitness Oakland Park) for the first time, they are offered a free trial day pass on the condition that they fill out a guest

pass form. Without explanation as to why, provision of a cellular telephone number is required on the form.

18.     Finally, if an individual decides to sign up, Defendants collect the cellular telephone number again (again without explanation) and provides the individual with a membership agreement (via email).

19.     None of the methods through which Defendants harvest cellular telephone numbers state or even infer that marketing texts will be sent to the phone number or that provision of the number  comprises consent to receive marketing text messages.

<b>FACTUAL ALLEGATIONS RELATING TO PLAINTIFF</b>

20.     On  or  about  November  28,  2017,  Plaintiff  visited  Defendants'  website, www.crunch.com, at which time he clicked on the link, "FREE TRIAL," after which he was directed to fill out an online form "for a 1-day pass to try us out."

21.     The form asked for Plaintiff's First Name, Last Name, Email, Phone Number, and Location of Interest, all of which were *required* fields in order to submit the form.

22.     After submitting the online form, Plaintiff received an online response stating, "Thanks for expressing interest in Crunch. Check your email for your free pass. We'll see you soon and sweaty!"

23.     The very next day, November 29, 2017, between approximately 9:30 a.m. and 10:00 a.m.. Plaintiff received three text messages in the space of 30 minutes, the first of which thanked him for his inquiry at Crunch Fitness, the second of which informed him that he would be receiving 8 messages per month, and the third contained an offer to join Crunch Fitness and pay no dues until 2018.

24.     The insert below is a true and accurate screenshot representation of Plaintiff's cellular telephone.



25.     The text messages were sent from the short code 87365, which upon information and belief, which is registered to mobile marketing provider, Textmunication.com, which specializes, among other things in health and fitness club mobile marketing campaigns.[1]

---

[1] Source: https://textmunication.com/industries/ (Last visited December 7, 2017)

26.     Textmunication is a "third-party telemarketer" within the meaning of the 2013 FCC Ruling Order, discussed *infra*.

27.     Eric Jozwiak, District Marketing Manager of Crunch Fitness had this to say about the success of its Textmunication mobile marketing campaign:

> *"Our goal was to increase membership sales and door swings at each of our clubs. After enrolling with Textmunication, we sold almost 700 memberships in just one day. We recommend Textmunication to other clubs because 'if they are not using this system, they are leaving money on the table.'"*

Source: https://textmunication.com/ (Last viewed December 7, 2017).

28.     Despite Defendants' clear intention for doing so, Plaintiff was in no way given any reason to believe, nor did Plaintiff contemplate, that by completing the online free trial form he would become the victim of unsolicited text message spam.

**TEXT MESSAGES PROVIDE TELEMARKETERS WITH INSTANT COMMUNICATION TO CONSUMERS TO PROMOTE GOODS AND SERVICES**

29.     In recent years, marketers stymied by federal laws limiting solicitation by telephone, facsimile machine, and email have increasingly looked to alternative technologies through which to send bulk solicitations to consumers easily and cheaply.

30.     One of the newest methods of bulk marketing is to advertise through text messages sent to mobile phones.

31.     Unlike faxes and unanswered phone calls, a text message allows virtually instantaneous communication with the recipient, almost anywhere in the world, day or night. Many cell phones immediately alert the recipient of new text messages. Consumers frequently use text messaging to stay in close contact with business colleagues and associates, family members, and friends. Text messaging is also used by schools, police departments, fire departments, and emergency medical services across the country.

32.     The instantaneous nature of text message communication makes it very appealing to telemarketers—and very annoying to consumers subjected to spam text messages.

33.     And unlike other forms of advertisement, spam texts can cost its recipients money. Many wireless customers have telephone plans that charge a fee for each text message, or that permit a limited number of text messages per month.

34.     Spam text messages are a burgeoning phenomenon. One authority estimates that Americans received more than four billion spam texts in 2011 more than double the number sent just two years earlier.

## OVERVIEW OF THE TCPA

35.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy . . . ." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227). Specifically, in enacting the TCPA, Congress outlawed telemarketing via unsolicited automated or pre-recorded telephone calls ("Robocalls"), finding:

> Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.
>
> . . . .
>
> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call . . . , is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Id. § 2(10) and (12); *See also Mims v. Arrow Financial Services, Inc.*, 132 S.Ct. 740 (Jan. 18, 2012).

36.     While imposing general restrictions on a wide set of telemarketing practices, the TCPA's strictest provisions apply to telemarketing by automatic telephone dialing system. *See* 47 U.S.C. § 227(b)(1).

37.     The statutory definition of an automatic telephone dialing system (sometimes called "autodialer") is "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator to dial the numbers[,]" and has the capacity to dial such numbers. Id. § 227(a)(1). The term also extends to predictive dialers and equipment that has the capacity to dial numbers without human intervention. *See* In The Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 F.C.C.R. 14014, 14093 (2003).

38.     With the limited exception of calls made for emergency purposes, the TCPA bans all calls to cell phones placed through an autodialer, regardless of whether they solicit the sale of goods or services, unless the recipient of the call provides "prior express consent" to receive the calls. 47 U.S.C. § 227(b); 47 C.F.R. § 64.1200(a)(1).

39.     "Prior express consent" exists where a consumer has (a) clearly stated that the telemarketer may call, and (b) clearly expressed an understanding that the telemarketer's subsequent call will be made for the purpose of encouraging the purchase of goods or services. See In The Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 10 F.C.C.R. 12391, 12396, para. 11 (1995).

40.     Under FCC regulations, telemarketing calls require prior express ***written*** consent. 47 C.F.R. § 64.1200(a)(2). (emphasis added).

41.     "Prior express written consent" means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered

to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. 47 C.F.R. § 64.1200(f)(8).

### *Vicarious Liability*

42.     Under the TCPA, as interpreted by the FCC, a person or entity can be liable for calls made on its behalf even if that person or entity did not directly dial those calls.

43.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum and Order, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995).

44.     In 2008, the FCC reiterated that "a company on whose behalf a telephone solicitation is made bears the responsibility for any violations." See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 Request of ACA International for Clarification and Declaratory Ruling, CG 02-278, 23 F.C.C.R. 559 at ¶10 (Jan. 4, 2008) (specifically recognizing "on behalf of" liability in the context of a robocall sent to a consumer by a third party on another entity's behalf under 47 U.S.C. 227(b)) .

45.     In May of 2013, the FCC reinforced this issue. See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, --- FCC Rcd. --- (F.C.C. May 9, 2013) (hereinafter "2013 FCC Ruling Order") (clarifying that "a seller … may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."). The FCC rejected a narrow view of TCPA liability, including the assertion that a seller's liability

requires a finding of formal agency and immediate direction and control over the third-party who

placed the telemarketing call. Id. n.107.

46.     The 2013 FCC Order further explained:

"To provide guidance in this area, we find that the following are illustrative examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations. For example, apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct. At a minimum, evidence of these kinds of relationships – which consumers may acquire through discovery, if they are not independently privy to such information – should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent.

"[ ] In sum, under our current rules and administrative precedent interpreting and implementing sections 227(b) and 227(c), we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under section either section 227(c) or section 227(b). **However, we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services.** In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised. In the case of either actions to enforce section 227(b) or actions to enforce do-not-call restrictions under section 227(c), we stress that nothing in this order requires a consumer to provide proof – at the time it files its complaint – that the seller should be held vicariously liable for the offending call. (emphasis added)

Id. at ¶¶ 46-47).

47.     Accordingly, it is undeniably clear, that an entity can be liable under the TCPA for a call made on its behalf even if the entity did not directly place the call under a number of theories, including vicarious liability. Under those circumstances, the entity is properly deemed to have initiated the call through the person or entity that actually placed the calls.

## CLASS ALLEGATIONS

48.     Plaintiff brings this action on behalf of a nationwide class of similarly situated individuals, which consists of:

> **All persons in the United States to whom, within the four years immediately preceding the filing of this Complaint, Defendants or some person acting on Defendants' behalf sent a text message to their cellular telephone advertising Defendants' goods and/or services, through the use of the same or materially similar telephone dialing equipment as that which was used to send the text at issue to the Plaintiff.**

49.     Plaintiff is a member of this class.

50.     Defendants and their employees or agents, Plaintiff's attorneys and their employees, the Judge to whom this action is assigned and any member of the Judge's staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress are excluded from the Classes.

51.     The class is so numerous that joinder is impracticable. Upon information and belief, as well as common experience of the size of automated dialing campaigns, there are more than one thousand persons in the class.

52.     Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting any individual member of the class, including plaintiff. Such questions common to the Class include, but are not limited to:

a. Whether the calls that are the subject of this lawsuit were made using an "automatic telephone dialing system" as proscribed by the TCPA and applicable FCC regulations and orders;

b. Whether the violation was negligent or willful.

53. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing his claims vigorously, and has retained counsel competent and experienced in class and complex litigation.

54. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

55. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

56. Defendants have acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole.

57. Prosecution of separate actions by individual members of the class, should they realize their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

58.     The identity of the class is likely readily identifiable from defendant's records, or the records of other person(s) involved with making the calls.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

**COUNT I**
**Violation of 47 U.S.C. § 227 and the Regulations Promulgate Thereunder**
**(On Behalf of Plaintiff and the Class)**

60.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

61.     It is a violation of the TCPA, 47 U.S.C. §227(b) to call a person's cellular telephone using an automatic telephone dialing system. The TCPA also specifically prohibits the use of an unsolicited text messages to advertise the sale of goods and services. 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200.

62.     Defendants, or some person on their behalf, initiated a call to plaintiff and others' cellular telephones, using an automatic telephone dialing system and/or an artificial or prerecorded voice.

63.     Plaintiff and the class are entitled to have their rights, status and legal relations under the TCPA relating to defendant's telemarketing to cell phones using an automatic dialing system and artificial or prerecorded voice.

64.     The defendant's calls were negligent placed, or alternatively, willfully placed despite prior knowledge of the TCPA.

**WHEREFORE**, plaintiff requests that the Court enter judgment in favor of himself and the class and against defendants that provides the following relief:

a. Statutory damages of $500 per violation, and up to $1,500 per violation if proven to be willful;

b. A permanent injunction prohibiting defendant from violating the TCPA in the future through calling cell phones using an automatic telephone dialing system and/or a prerecorded voice message;

c. A declaration that defendant used an automatic telephone dialing system and artificial or prerecorded voice, and violated the TCPA in using such for calls to the cell phones of plaintiff and the class; and

d. Any other relief the Court finds just and proper.

**JURY DEMAND**

65.    Plaintiff demands trial by jury.


Dated:  December 6, 2017

Respectfully submitted,


By: /s/ Jibrael S. Hindi
Jibrael S. Hindi, Esq.
THE LAW OFFICE OF JIBRAEL S. HINDI, PLLC
110 SE 6th Street
Ft. Lauderdale, FL 33301
Tel: (954) 907-1136
Fax: (855) 529-9540
jibrael@jibraellaw.com


Scott D. Owens, Esq.
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com